**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JESUS ALEMAN, | ) Case No. 1:14-cv-00728-LJO-JLT |
| Petitioner, | ) |
| | ) FINDINGS AND RECOMMENDATIONS TO |
| v. | ) DENY PETITION FOR WRIT OF HABEAS |
| | ) CORPUS |
| CDCR, Director, | ) (Doc. 1) |
| | ) |
| Respondent. | ) ORDER DIRECTING THAT OBJECTIONS BE |
| | ) FILED WITHIN TWENTY-ONE DAYS |
| | ) |

        In 2011, Jesus Aleman was convicted of various serious crimes.  The trial court sentenced him to life with the possibility of parole plus 120 years-to-life.  In this action, he claims the Court should grant his habeas petition due to ineffective assistance of trial and appellate counsel, instructional error by the trial court, bias by the trial court and because of prosecutorial misconduct.  The Court finds Petitioner has failed to demonstrate any grounds for the relief he seeks and recommends his petition be **DENIED**.

**I.      PROCEDURAL HISTORY**

        In 2011, Petitioner was convicted of first degree murder, attempted murder, shooting at an inhabited dwelling, and shooting from a motor vehicle.  (Doc. 13, Ex. A, p. 55) The jury found true the firearms and gang enhancements.  (Id.)  As a result, the trial court sentenced him to a custodial term of life with the possibility of parole plus a term of 120 years-to-life.

1

Petitioner appealed to the California Court of Appeals, Fifth Appellate District (the "5th DCA"), which affirmed the conviction.  (Lodged Document ("LD") 19; Doc. 13, Ex. A)   He next filed a petition for review in the California Supreme Court, but that court denied it.  (LD 20) Petitioner then filed a state habeas petition in the California Supreme Court that was denied.  (LD 22)  In its summary denial, the court cited People v. Duvall, 9 Cal.4th 464, 474 (1995), and In re Swain, 34 Cal.2d 300, 304 (1949).  (Id.)

## II.      FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the 5th DCA's unpublished decision[1]:

### First Trial

Shortly before 5:40 p.m. on October 3, 2009, Raylyne Subia was driving her white Pontiac to the Super 7 on Inyo Street, Tulare, to get gas.  With her was Alexander Espino, a northern gang associate.  They were on Inyo, waiting for a train to pass, when a black Honda Civic pulled up next to the driver's side of the Pontiac.  There were perhaps five people in the Honda, all staring. Subia saw the Honda's driver and front passenger with a gun, although she was not sure if each had his own gun or if the driver passed the gun to the passenger.

Once the train passed, Subia continued on to the Super 7.  The black car came back around toward Inyo, then pulled over on I Street, near to where Subia and Espino were pumping gas. The driver pointed a gun at Subia.  Espino took his own gun out in response, but did not point it at anyone. Subia did not remember where they went when they left the Super 7.   Shown a photographic lineup by police, Subia and Espino each identified defendant as the person who pointed the gun.

Shortly after the incident at the Super 7, Isabel Rodriguez, her sister Mireya Rodriguez, brother Antonio Rodriguez, and friend Lovina Gonzalez, were in the garage of the Rodriguez apartment in the 100 block of West Owens, at I Street, in Tulare.  Also present were George Vieira, Anthony Brooks, and Raymond.  Everyone was just "hang[ing] out," talking, and Raymond may have been smoking a cigarette.  The car door to the garage was open. Isabel did not see anyone with a weapon.

According to Isabel, three vehicles passed by while the teenagers were in the garage.  The people in the first two vehicles merely stared.  The third vehicle, a black Honda, passed by on I Street. Isabel saw two people in the front, and either two or three people in the back. Defendant was driving.  Jesus Vargas, whom Isabel knew from school and who associated with southern gang members, was the front seat passenger.  The first time they passed, no weapon was displayed.  They drove slowly by and "mugged" those in the garage ("staring at [them] real ugly"), then turned down Owens Street and went around the block.  The black Honda drove past again and made a U-turn.  On one occasion when they passed, Vargas "threw up a three" with his fingers—something southerners do—and said something.  After the car made the U-turn, defendant pulled out a revolver and started shooting. Isabel heard three or four shots, about a second's pause, and then a couple more.  She did not remember if defendant said anything to those in the garage before he started shooting. She just remembered people screaming.

---

[1] The 5th DCA's summary of the facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1). Thus, the Court adopts the factual recitations set forth by the 5th DCA.

Defendant, who was closest to Isabel, held the gun with his arm extended, while Vargas held the steering wheel. When defendant first pointed the gun, Isabel was outside of the garage. The others were still inside it. Defendant was pointing the gun at the entrance of the garage.

Mireya said she had been shot, then fell to the ground. Isabel and Lovina picked her up and tried to move her inside, as shots were still being fired. Isabel called 911. Other than Mireya, no one was injured in the shooting.

Officer O'Donohoe of the Tulare Police Department was the first officer on the scene. He arrived at approximately 5:45 p.m., and found Mireya lying on the cement walkway between the doors of the two apartments closest to I Street. She was conscious and vomiting, and near her navel was what appeared to be the entrance wound of a small caliber bullet. O'Donohoe took a statement from Isabel, who was wearing a red 49ers jacket.

No shell casings were found at the scene, suggesting the gun used was a revolver. Police counted five shots to the structure itself, including two that went through the back wall of the garage into the apartment beyond, plus a sixth to Mireya.

Mireya died from a gunshot wound to the abdomen. The bullet, which lodged in her spine and was determined to be .22 caliber, went through the abdominal aorta, causing her to bleed to death internally.

A day or two after the shooting, defendant, who was under arrest, waived his rights and spoke to Detectives Brian and James Haney. Defendant, whose moniker was "Brown Boy," denied being involved in any kind of gang, but admitted hanging out with the South Side Kings, a southern gang. On Saturday, he drove to Mulcahy Park in the black four-door Honda Civic that belonged to his father-in-law. He arrived at the park around 5:30 or 5:40 p.m. There were about 10 people at the park. He stayed until around 8:00 p.m., but some northerners came and there was shooting, so he just walked to his friend's house. He left the car at the park. When he returned, the police came, so he gave the keys to his friend "Charito," who took the car. Defendant did not want to get caught because he did not have a license. When the fight broke out at the park, Charito had a .45–caliber gun. Defendant stated that he himself never carried a gun.

After further discussion, defendant denied being involved in an incident in which he shot a gun from his car. He related that before he went to the park, he went to the fairgrounds. When he left, he drove down Inyo Street and got stopped by a train. A white car pulled up next to him. A woman was driving. The man in the car lowered the window and pointed a gun at defendant. Defendant recognized the man as being a northerner. After the train passed, the white car went to the Super 7. Defendant drove past and turned around and slowly drove past again, and the man took out the gun again. Defendant then just left for the park. Defendant admitted Jesus Vargas was in the car with him when this happened. Told Vargas had talked to the detectives, defendant insisted he only went to the park. He denied anyone in his car had a gun, but admitted a Sureño known as "Mundo" and someone called "Morte" (meaning death) were also in the car. Defendant denied ever going on I Street. Defendant admitted taking the Marquis Auto Sales license plate frame and the crown decal off of the car.

Eventually, defendant said he did not mean for someone to get hurt. Defendant was not trying to hurt anyone or scare them; he was not the one who shot. Defendant named Charito as the person who shot. After further discussion, defendant said he was not trying to kill anyone. Told he had been picked out of photo lineups and asked whether he wanted to kill someone or just to scare them, defendant said "scare." He admitted shooting more than once, although he did not know how many times, with a small, .22–caliber gun. Defendant claimed Vargas, Michael (whose nickname was "Bullet," but whose last name defendant did not know), and Morte also shot. After the shooting, the guns—which belonged to the gang—disappeared. Morte took them

both.
Defendant said he felt bad about what happened.  Asked what caused him to do it, defendant said some fat guy acted like he had a gun.  Defendant did not see a gun, but that was how he had gotten shot once before.  Defendant admitted being involved in gangs since he was 12.  He claimed Morte was the one who pointed the gun at the man in the white car.  As for the house at which the shooting occurred, defendant frequently passed by there. It was close to Super 7.  The people at the house called him a "scrap."

Tulare Police Officer Guzman testified as an expert in criminal street gangs.  He explained that a gang is three or more people who associate together on a regular basis, and who have common symbols, numbers, and colors that they use to identify themselves.  They usually "hang out" in a certain area.  They have a hierarchy, and they collectively and individually engage in criminal activity to benefit the gang.  Sureños—also known as southerners—are a gang that started in the prison system.  South Side Kings, or SSK, is a local clique that falls under the umbrella of the Sureño gang.  The primary activities of the southern gang are homicide, attempted homicide, drive-by shooting, robbery, drug sales, extortion, rape, and assault with deadly weapons.  The South Side Kings claim what they call the southwest, which is on the west side of Tulare in the area of Mulcahy School.  They wear blue and claim the number 13, while their rivals—Norteños or northerners—wear red and claim the number 14.  South Side Kings have usually had orders to do what they have to, including fighting, stabbing, and shooting, when they come across rival gang members.

Guzman researched defendant, whose moniker was Brown Boy and who had a tattoo of three dots, which represented the number 13, on a finger.  In Guzman's opinion, defendant was an active southern gang member.  Through hypothetical questions, Guzman opined the shooting in this case promoted and benefitted the gang.  He explained that "scrap" is a derogatory term used by northern gang members to disrespect southern gang members.  Respect is important in the gang culture.  A gang member cannot let an insult, such as being called a scrap, go; to do so would allow the gang member to be seen as weak by both fellow and rival gang members, and weakness is not welcome in a gang.  The shooting would benefit the gang by intimidating and inflicting fear on rival gang members.  It would also benefit the gang by intimidating citizens in the area.

### Retrial on Count 1

Shortly before 5:40 p.m. on October 3, 2009, Raylyne Subia and Alexander Espino, a northerner, were waiting near the Super 7 in Tulare for a train to pass, when a black Honda containing a "carload of people" pulled up alongside.  Someone in the car said something about South Side Kings, and one of the vehicle's occupants waived a gun at Subia and Espino.

Subia and Espino continued on to the Super 7.  A black Honda drove by and pulled over to the curb on I Street while Subia was pumping gas, and the driver pointed a gun at her. Espino pulled out his own gun, but did not point it.  The couple got in Subia's car and left.  The Honda was headed southbound on I Street, and Subia went the opposite way.  When Subia subsequently was shown a photographic lineup, she identified defendant as the person she thought was the Honda's driver.

Shortly after the incident at the Super 7, Isabel Rodriguez was at her house at the intersection of I Street and Owens.  She, her sister Mireya, brother Antonio, friends Lovina Gonzalez and Raymond, and Antonio's friends George Vieira and Anthony Brooks, were in the garage, talking and "hanging out."  Nobody had any weapons.

A black Honda containing four or five people drove slowly by, headed southbound on I Street. Defendant was driving.  Isabel recognized the front passenger as Jesus Vargas, with whom she had gone to school and whom she knew to associate with southerners.  At some point, Vargas

4

threw up three fingers, a gang sign signifying southerners. Isabel believed he did this the first time the car drove by. Those in the car were looking at those in the garage, and Isabel stared at them as they passed. She did not hear anyone in the garage say anything to the people in the Honda at any time.

The car went around the block and then came back by, again slowly heading southbound. Isabel did not see any weapons. The car then turned around and came back north, traveling "pretty slow" in the middle of the road. Defendant, who was still the driver, pulled out a revolver she believed was .22 caliber, and started shooting. Vargas held the steering wheel while defendant fired. Isabel was standing outside of the garage. Everyone else was in the garage. While defendant was still firing, Mireya said she was shot and fell to the ground. Isabel and Lovina tried to pick her up because she said she could not walk, but they were unable to carry her. As they put her on the ground, Isabel saw she had been shot in the abdomen. Isabel called 911. Defendant turned west on Owens and drove off. Isabel believed six or seven shots were fired.

At approximately 5:45 p.m. on Saturday, October 3, 2009, Officer O'Donohoe of the Tulare Police Department responded to a dispatch of a shooting at a multi-residence dwelling in the 100 block of West Owens in Tulare. He was the first officer on the scene, and arrived to find Mireya lying on the ground with people surrounding her. She was still alive, but had an entrance wound for what appeared to be a small caliber handgun next to her navel. She was vomiting. Mireya subsequently died. The cause of death was a gunshot wound to the abdomen. A bullet that was approximately .22 caliber was recovered from her spine. It had gone through her abdominal aorta, causing her to bleed to death within minutes. Assuming Mireya was standing when shot, the track of the bullet was front to back, approximately horizontal, and 30 degrees right to left.

Six bullet holes were found inside the garage. Several went completely through the wall shared by the garage and residence beyond. No shell casings were found, indicating the weapon used was probably a revolver. Twenty-two-caliber revolvers typically hold six-to-eight rounds. No gun was ever found in this case.

At the time of the shooting, Lovina was wearing a red hat. Isabel, Mireya, and Lovina associated with northerners, but nobody inside the garage was wearing red clothing aside from the hat. Although Isabel was wearing a red jacket when interviewed by the police, she did not put it on until after the shooting. The day after the shooting, Isabel was shown photographic lineups and identified defendant as the driver and Vargas as the passenger.

Vargas was arrested early on the morning after the shooting. Defendant was arrested that evening. Although he was on foot at the time, he confirmed he drove a black Honda. At the time of his arrest, he was wearing a black shirt with a light blue-and-white logo and letter S on the front. In the experience of Tulare Police Detective Brian Haney, this was consistent with attire that Sureño gang members would wear.

Haney executed a search warrant at defendant's residence. While he was there, a black Honda driven by defendant's girlfriend pulled up. The car was consistent with the Honda visible on the video taken at Super 7 of the incident involving Subia and Espino. In the trash next to the driveway was a discarded decal consistent with the crown decal described by witnesses to the shooting. No blue clothing or gang indicia were found in the residence. However, a CD case with "SSK" on the front was found in the driver's map pocket of the Honda. A metal dog tag on the ignition key ring had "Kings" with a crown on the front. No ammunition or ballistics evidence was found in the car.

Haney interviewed defendant following his arrest and after advising defendant of his rights. Defendant admitted being in the area of Super 7, and said he recognized Espino and knew him to be a northerner. Defendant said he himself associated with the southerners. Defendant

5

admitted driving a four-door, black Honda Civic, and said it belonged to his live-in girlfriend. Defendant admitted the car had had a crown decal in the back window, but said he took it and the Marquis Auto Sales license plate frame off of the car after the shooting.

Defendant admitted being involved in the shooting.  He said he was driving the Honda, and there were three other people in the car.  Defendant identified Jesus Vargas as the front passenger, but would not identify, by full name, the two people in the back.  He related that after the incident at Super 7, he proceeded southbound on I Street and passed the victim's residence.  He saw several people in the garage and believed they were northerners. He drove past the residence, then made a U-turn and came back.  He then fired a .22–caliber handgun at the people he thought were northerners.

Officer Guzman testified as a gang expert. SSK—South Side Kings—is a clique of the Sureño gang that had about 15 to 20 members at the time of trial, and possibly 30 members in 2009.  In the prison system in the 1960's, inmates from Southern California formed the Mexican Mafia to protect themselves from other prison gangs, like their main rivals the Nuestra Familia. Sureños—southerners—identify with the color blue and the number 13, the latter representing the 13th letter of the alphabet, M, which shows allegiance to the Mexican Mafia.  A tattoo of three dots is common and goes back to the number 13. Northern gang members, also known as Norteños, are the rivals of Sureños. Norteños identify with the color red and the number 14. The latter represents the 14th letter of the alphabet, N, for northern or "Norte."  Four dots is a common Norteño tattoo.

A Sureño will commonly hold up three fingers to indicate his allegiance to the southern gang. Hand signs usually are shown to rival gang members as a form of disrespect.  Guzman had investigated and heard of cases in Tulare in which Sureños identified themselves to rival gang members, by hand signs or shouting their gang name, just before committing a crime against those rivals.  Rival gangs go into each other's areas and commit crimes.  Doing so shows disrespect to the gang in whose territory the crime is committed.  The 100 block of West Owens is considered a northern area.

In 2009, the primary activities of the Sureño gang, including the South Side Kings, were murder, attempted murder, robbery, carjacking, drug sales, possession of firearms, assault with deadly weapons, drive-by shooting, and battery.  Guzman knew, and had researched, defendant. Defendant was a member of the South Side Kings.  During a contact on September 24, 2009, defendant admitted to Guzman that he was an active southern gang member and had been one since he was 13 years old.  Defendant said he was jumped in by three South Side Kings members for 13 seconds.  At the time of his arrest in this case, defendant was with other southern gang members.  Defendant was wearing a South Pole-brand shirt, which is commonly used by southern gang members because it has a blue S written on it.  In addition, defendant's inmate classification questionnaire stated he associated with southerners and he did not get along with northerners.

Guzman opined that as of October 3, 2009, defendant was an active member of the South Side Kings Sureño gang.  Guzman further opined that Jesus Vargas, with whom he was familiar from prior contacts, was also an active member of the South Side Kings Sureño gang on that date. Isabel and Mireya were associates of the northern gang, as shown by gang-related writing found on a mirror in their home.

In answer to hypothetical questions based on the evidence adduced at trial, Guzman opined that a shooting such as occurred in this case was committed in association with a criminal street gang, in that it involved a carload of southern gang members associating together.  He further opined it would benefit the Sureños by inflicting fear and intimidation on a rival gang and its associates, and by earning respect.

6

1   (Doc. 13, Ex. A, pp. 56-67)

2   **III.    DISCUSSION**

3       A.    Jurisdiction

4       Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to

5   the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the

6   United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor, 529 U.S. 362, 375 n.

7   7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States

8   Constitution.  The challenged conviction arises out of the Kern County Superior Court, which is located

9   within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

10      On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996

11  ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v.

12  Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997);  Jeffries v. Wood,

13  114 F.3d 1484, 1500 (9th Cir. 1997), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds*

14  *by* Lindh v. Murphy, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after statute's

15  enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed

16  by its provisions.

17      B.    Legal Standard of Review

18      A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the

19  petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was

20  contrary to, or involved an unreasonable application of, clearly established Federal law, as determined

21  by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an

22  unreasonable determination of  the facts in light of the evidence presented in the State court

23  proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S.

24  at 412-413.

25      A state court decision is "contrary to" clearly established federal law "if it applies a rule that

26  contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts

27  that is materially indistinguishable from a [Supreme Court] decision but reaches a different result."

28  Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams, 529 U.S. at 405-406 (2000).

1    In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court

2    explained that an "unreasonable application" of federal law is an objective test that turns on "whether

3    it is possible that fairminded jurists could disagree" that the state court decision meets the standards set

4    forth in the AEDPA. The Supreme Court has "said time and again that 'an *unreasonable* application of

5    federal law is different from an *incorrect* application of federal law.'" Cullen v. Pinholster, 131 S.Ct.

6    1388, 1410-1411 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from a federal court

7    "must show that the state court's ruling on the claim being presented in federal court was so lacking in

8    justification that there was an error well understood and comprehended in existing law beyond any

9    possibility of fairminded disagreement." Harrington, 131 S.Ct. at 787-788.

10    The second prong pertains to state court decisions based on factual findings.  Davis v.

11    Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003).  Under § 2254(d)(2), a

12    federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted

13    in a decision that was based on an unreasonable determination of the facts in light of the evidence

14    presented in the State court proceeding." Wiggins v. Smith, 539 U.S. at 520; Jeffries v. Wood, 114

15    F.3d at 1500.  A state court's factual finding is unreasonable when it is "so clearly incorrect that it

16    would not be debatable among reasonable jurists."  Id.; see Taylor v. Maddox, 366 F.3d 992, 999-1001

17    (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

18    To determine whether habeas relief is available under § 2254(d), the federal court looks to the

19    last reasoned state court decision as the basis of the state court's decision.  See Ylst v. Nunnemaker,

20    501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  "[A]lthough we

21    independently review the record, we still defer to the state court's ultimate decisions."  Pirtle v.

22    Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

23    The prejudicial impact of any constitutional error is assessed by asking whether the error had "a

24    substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson,

25    507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht

26    standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

27    C.    Review of Petitioner's Claims

28    The petition alleges the following as grounds for relief: (1) ineffective assistance of trial

8

counsel; (2) error to instruct jury on "kill zone"; (3) judicial bias; (4) prosecutorial misconduct; (5) error in reasonable doubt instruction; and (6) ineffective assistance of appellate counsel.

### 1.   Ineffective Assistance of Trial Counsel

Petitioner first contends that his trial counsel was ineffective for failing to present evidence, or to elicit evidence on cross-examination, of provocation by the victims.  Petitioner believes such evidence would have resulted in a conviction for second degree murder rather than first degree murder.

### i.   The 5th DCA's Opinion

The Fifth DCA rejected Petitioner's claim of ineffective assistance of trial counsel as follows: Despite finding defendant committed attempted premeditated murder with respect to the live victims, the jury in his first trial could not unanimously agree whether his killing of Mireya constituted first degree or second degree murder.  The jury in the retrial of count 1 convicted defendant of first degree murder.  Defendant now points to evidence of alleged provocative conduct by the victims (for example, wearing red and shouting profanity or insults at defendant and his group) that was presented in the first trial, but not the second.  He faults his trial attorney for not presenting this evidence, or at least eliciting it through cross-examination, and says counsel's deficient performance prejudiced him because it is reasonably probable the absence of the evidence made the difference between a conviction of second degree murder and a conviction of first degree murder with special circumstances.  Defendant's claim lacks merit. The burden of proving ineffective assistance of counsel is on the defendant. (People v. Pope (1979) 23 Cal.3d 412, 425.)  "To secure reversal of a conviction upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings. [Citations.]  'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (People v. Cunningham (2001) 25 Cal.4th 926, 1003; see generally  Strickland v. Washington (1984) 466 U.S. 668, 687–694.)  This is a "'high bar,'" and surmounting it is not easy. (Harrington v. Richter (2011) 562 U.S. ___ [131 S.Ct. 770, 788].)

In order to prevail on a claim of ineffective assistance of counsel on appeal, the defendant "must establish deficient performance based upon the four corners of the record"  (People v. Cunningham, supra, 25 Cal.4th at p. 1003), which "must affirmatively disclose the lack of a rational tactical purpose for the challenged act or omission. [Citations.]"  (People v. Ray (1996) 13 Cal.4th 313, 349.)  "Judicial scrutiny of counsel's performance must be highly deferential.... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [Citation.]" (Strickland v. Washington, supra, 466 U.S. at p. 689; accord, People v. Hinton (2006) 37 Cal.4th 839, 876.) In addition, the defendant must prove prejudice "as a 'demonstrable reality,' not simply speculation as to the effect of the errors or omissions of counsel. [Citation.]"  (People v. Williams (1988) 44 Cal.3d 883, 937.)

In the present case, defense counsel asked the first jury to consider a verdict of voluntary manslaughter based on sudden quarrel or heat of passion.  From the jury's verdicts on the

attempted murder counts—and even the numerical split on the murder charge (nine votes for first degree murder and three votes for second degree murder)—it was readily apparent the strategy was completely unsuccessful.

Under the circumstances, counsel reasonably employed different tactics at the retrial. Although he argued to the court, unsuccessfully, that the court might base voluntary manslaughter instructions on the theory that when defendant shot into the garage, he was still angry from his confrontation with Subia and Espino, counsel did not expend much effort in an attempt to garner a voluntary manslaughter verdict from evidence that simply did not demonstrate the requisite provocation. (See, e.g., People v. Enraca (2012) 53 Cal.4th 735, 759 [for objective component of heat-of-passion voluntary manslaughter, victim's conduct must have been sufficiently provocative to cause ordinary person of average disposition to act rashly or without due deliberation and reflection; standard is not reaction of "'reasonable gang member,'" and insults and gang-related challenges are insufficient to merit voluntary manslaughter instruction]; People v. Najera (2006) 138 Cal.App.4th 212, 226 [victim's calling defendant derogatory name insufficient to cause ordinary person to lose reason and judgment under objective standard; hence, defendant not entitled to voluntary manslaughter instruction].) Rather, recognizing his client had confessed—a circumstance that "did not bode well for a successful defense" (People v. Scott (1997) 15 Cal.4th 1188, 1212)—defense counsel used his questioning of Detective Haney to try to plant the notion defendant's incriminating statement was the product of the detectives threatening to arrest his girlfriend and have his child taken away from him if he did not confess, and he focused on attacking the eyewitness identifications of defendant as the shooter.

"It is not deficient performance for a criminal defendant's counsel to make a reasonable tactical choice. [Citations.] Reasonableness must be assessed through the likely perspective of counsel at the time." (People v. Ochoa (1998) 19 Cal.4th 353, 445, fn. omitted; see People v. Slaughter (2002) 27 Cal.4th 1187, 1221–1222 [record on appeal failed to show use of different tactics at retrial was unreasonable under the circumstances].)

Moreover, defendant has manifestly failed to establish prejudice. "To prove first degree murder of any kind, the prosecution must first establish a murder within section 187—that is, an unlawful killing with malice aforethought. [Citations.]" (People v. Stanley (1995) 10 Cal.4th 764, 794.) Malice may be express or implied. (§ 188.) Express malice exists when there is an intent to kill, while implied malice exists "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (Ibid. ) Where the killing occurs upon a sudden quarrel or heat of passion, the malice aforethought required for murder is negated and the offense is reduced to voluntary manslaughter. (People v. Carasi (2008) 44 Cal.4th 1263, 1306.)

"Provocation of a kind, to a degree, and under circumstances insufficient to fully negative or raise a reasonable doubt as to the idea of both premeditation and malice (thereby reducing the offense to manslaughter) might nevertheless be adequate to negative or raise a reasonable doubt as to the idea of premeditation or deliberation, leaving the homicide as murder of the second degree; i.e., an unlawful killing perpetrated with malice aforethought but without premeditation and deliberation." (People v. Thomas (1945) 25 Cal.2d 880, 903.) In the present case, however, not only was defendant prosecuted for first degree murder on the theory the murder was willful, deliberate, and premeditated, he was also prosecuted on the alternate theory of so-called drive-by murder.

Section 189 establishes drive-by murder as a separate category of first degree murder. (People v. Rodriguez (1998) 66 Cal.App.4th 157, 163–164; see People v. Chavez (2004) 118 Cal.App.4th 379, 385–386.) "'"A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in

advance. [Citations.]"" (<u>People v. Booker</u> (2011) 51 Cal.4th 141, 172.)  Drive-by first degree murder, by contrast, does not require a showing of premeditation and deliberation. Rather, "[e]ven without a showing of premeditation, if defendant was shown to have intentionally discharged his firearm from a motor vehicle with the specific intent to inflict death, then his crime was murder in the first degree by operation of section 189."  (<u>People v. Sanchez</u> (2001) 26 Cal.4th 834, 849; <u>accord, People v. Chavez, supra</u>, 118 Cal.App.4th at pp. 386–387 [drive-by murder requires specific intent to kill, but not premeditation, in order to constitute first degree murder under § 189].)

We are aware of no authority, and defendant cites none, in which provocation has been held to negate, or raise a reasonable doubt as to the existence of, intent to kill. (<u>See People v. Rogers</u> (2006) 39 Cal.4th 826, 878–880 & cases cited [discussing CALJIC No. 8.73 (counterpart of CALCRIM No. 522), relating provocation to premeditation]; <u>but see People v. Cole</u> (2004) 33 Cal.4th 1158, 1211–1212 [provocation as related to mental state required for murder by torture, i.e., intent to inflict extreme pain].)  We know, from the jury's unanimous finding on the drive-by special circumstance, that, whatever jurors concluded with respect to premeditation, they at least unanimously agreed defendant committed a drive-by murder with respect to which he harbored express malice. Given the jury's finding, the killing could not be anything less than first degree murder. (<u>Cf. People v. Seaton</u> (2001) 26 Cal.4th 598, 665 [under felony-murder rule, killing in commission of felonies enumerated in § 189 constitutes first degree murder even if killer acted in unreasonable self-defense]; <u>People v. Battle</u> (2011) 198 Cal.App.4th 50, 75 [if jury found murder by lying in wait, provocation was irrelevant because, under § 189, murder could not be reduced to second degree murder].)

(Doc. 13, Ex. A, pp. 67-72.)

> ii.   <u>Federal Standard</u>

Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. <u>Evitts v. Lucey</u>, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of counsel are reviewed according to <u>Strickland's</u> two-pronged test. <u>Miller v. Keeney</u>, 882 F.2d 1428, 1433 (9th Cir.1989); <u>United States v. Birtle</u>, 792 F.2d 846, 847 (9th Cir.1986); <u>see also</u> <u>Penson v. Ohio</u>, 488 U.S. 75(1988) (holding that where a defendant has been actually or constructively denied the assistance of counsel altogether, the <u>Strickland</u> standard does not apply and prejudice is presumed; the implication is that <u>Strickland</u> does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things. First, he must establish that counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms. <u>Strickland v. Washington</u>, 466 U.S. 668, 687-88 (1984). Second, Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. <u>Id</u>. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. <u>Id</u>. The relevant inquiry is not what

1    counsel could have done; rather, it is whether the choices made by counsel were reasonable. Babbitt v.

2    Calderon, 151 F.3d 1170, 1173 (9th Cir.1998).

3         With the passage of the AEDPA, habeas relief may only be granted if the state-court decision

4    unreasonably applied this general Strickland standard for ineffective assistance.  Knowles v.

5    Mirzayance, 556 U.S. ___, 129 S.Ct. 1411, 1419 (2009).  Accordingly, the question "is not whether a

6    federal court believes the state court's determination under the Strickland standard "was incorrect but

7    whether that determination was unreasonable–a substantially higher threshold."  Schriro v. Landrigan,

8    550 U.S. 465, 473 (2007); Knowles, 129 S.Ct. at 1420.  In effect, the AEDPA standard is "doubly

9    deferential" because it requires that it be shown not only that the state court determination was

10   erroneous, but also that it was objectively unreasonable.  Yarborough v. Gentry, 540 U.S. 1, 5 (2003).

11   Moreover, because the Strickland standard is a general standard, a state court has even more latitude to

12   reasonably determine that a defendant has not satisfied that standard.  See Yarborough v. Alvarado, 541

13   U.S. 652, 664 (2004)("[E]valuating whether a rule application was unreasonable requires considering

14   the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in

15   case-by-case determinations").

16        The state court identified the appropriate federal standard by applying Strickland.[2]  Thus, the

17   only issue is whether the state court's adjudication, i.e., that defense counsel's representation was

18   neither deficient nor prejudicial, was not contrary to or an unreasonable application of Strickland.  For

19   the reasons discussed below, the Court concludes that it was not.

20                              iii.    Analysis

21        Petitioner argues that trial counsel was ineffective by failing to present or elicit potential

22   provocation evidence in re-trial on the murder charge after such evidence had been presented in the first

23   trial.  In rejecting that argument, the 5th DCA reasoned that a reasonable attorney could have concluded

24   that different tactics were required at the re-trial because it was clear that the jury at the first trial had

25   rejected his defense of voluntary manslaughter based on heat of passion or a sudden quarrel arising

26   from Petitioner's earlier encounter with Subia and Espino.  Under those circumstances, the state

27

28   ―――――――――――――
     [2]The 5th DCA cited Williams v. Taylor, 529 U.S. at 390-391, which, in turn, refers to Strickland.

                                           12

appellate court reasoned that a change in tactics was not unreasonable and that the tactic chosen, to suggest that Petitioner's acknowledgment of his involvement in the shooting of the victim was the result of the interrogator's threats regarding Petitioner's girlfriend and child, was likewise not unreasonable.

Deficient performance" in the context of an ineffectiveness claim means unreasonable representation falling below professional norms prevailing at the time of trial. <u>Strickland</u>, 466 U.S. at 688–89. To show "deficient performance," a petitioner must overcome a "strong presumption" that his lawyer "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." <u>Id</u>. at 690. The Court must then "determine whether, in light of all the circumstances, the identified acts or omissions were outside the range of professionally competent assistance." <u>Id</u>. The Supreme Court in <u>Strickland</u> recognized that "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." <u>Id</u>. at 689. Accordingly, to overturn the strong presumption of adequate assistance, a petitioner must demonstrate that "the challenged action cannot reasonably be considered sound trial strategy under the circumstances of the case." <u>Lord v. Wood</u>, 184 F.3d 1083, 1085 (9th Cir.1999).

Furthermore, reasonable tactical decisions, including decisions with regard to the presentation of the case, are "virtually unchallengeable." <u>Strickland</u>, 466 U.S. at 687–90. "The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." <u>United States v. Nersesian</u>, 824 F.2d 1294, 1321 (2nd Cir.1987); <u>Morris v. California</u>, 966 F.2d 448, 456 (9th Cir.1991) (a tactical decision not to call a particular witness cannot form the basis of an ineffective assistance of counsel claim, even if the defendant disagrees with the decision).

Petitioner has not alleged or otherwise demonstrated that the decisions made by his attorney were not a matter of sound trial tactics or that they lacked any rational tactical purpose. <u>See e.g.</u>, <u>People v. Fosselman</u> (1983) 33 Cal.3d 572, 581-582 (Reviewing courts will reverse convictions on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission). To the contrary, the record shows that the jury in the

13

first trial was split, with nine members voting for guilt on first degree murder, despite the fact that defense counsel sought to elicit evidence of a sudden quarrel or heat of passion resulting from the earlier encounter with Subia and Espino.  Given that circumstance, it was not only reasonable, but eminently reasonable, for defense counsel to pursue a different defense strategy in the re-trial.  Since Petitioner had in essence confessed to the crime already, any potential defense would have necessarily had to account for his acknowledgment of guilt.  At the second trial, counsel's attempt to portray Petitioner's confession as the result of police duress and threats, while unsuccessful, was, nevertheless, a reasonable tactic under the circumstances.  Thus, Petitioner has not shown deficient performance.

On the prejudice prong, the 5th DCA noted that Petitioner was prosecuted for first degree murder under two separate theories, i.e., premeditation and as a drive-by murder.  Under California law, as the appellate court pointed out, proof of a drive-by murder requires neither premeditation nor deliberation.  Under state law, if Petitioner discharged his firearm from a vehicle with the specific intent to inflict death, the crime is a first degree murder regardless of deliberation or premeditation.  Under the circumstances in this case, the evidence supporting a first degree murder conviction for drive-by murder is overwhelming, as confirmed by the jury's finding regarding the drive-by special circumstance.  Thus, Petitioner cannot show prejudice because counsel failed to elicit evidence of a sudden heat of passion at the second trial since such evidence would not have had any effect on the drive-by murder theory of first degree murder.

B.        "Kill Zone" Instructional Error

Petitioner next contends that the trial court erred in allowing the term "kill zone" to be used in an instruction on attempted murder.  Petitioner appears to argue, as he did in state court, both that the term was inflammatory and poorly defined in the instruction.

1.        The 5th DCA's Opinion

The 5th DCA denied Petitioner's instructional error claim as follows:

Defendant fired multiple shots at a group of people in, and just outside, a garage. With respect to counts 2 and 3, which charged him with attempted premeditated murder, the jury was instructed in pertinent part, pursuant to CALCRIM No. 600:

"The defendant is charged in Counts 2 AND 3 with attempted murder.

"To prove that the defendant is guilty of attempted murder, the People must prove that:

14

"1. The defendant took direct but ineffective steps toward killing another person;" AND

"2. The defendant intended to kill that person. [¶] ... [¶]

"A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.' In order to convict the defendant of the attempted murder of ANTONIO RODRIGUEZ, ISABEL RODRIGUEZ, LOVINA GONZALEZ, ANTHONY BROOKS, AND GEORGE VIE[I]RA, the People must prove that the defendant not only intended to kill ANTONIO RODRIGUEZ, ISABEL RODRIGUEZ, but also either intended to kill LOVINA GONZALEZ, ANTHONY BROOKS, RAYMOND LOPEZ, AND GEORGE VIE[I]RA, or intended to kill everyone within the kill zone. If you have a reasonable doubt whether the defendant intended to kill ANTONIO RODRIGUEZ, ISABEL RODRIGUEZ, LOVINA GONZALEZ, ANTHONY BROOKS, AND GEORGE VIE[I]RA or intended to kill, LOVINA GONZALEZ, ANTHONY BROOKS, RAYMOND LOPEZ, AND GEORGE VIE[I]RA by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of ANTONIO RODRIGUEZ, ISABEL RODRIGUEZ, LOVINA GONZALEZ, ANTHONY BROOKS, AND GEORGE VIE[I]RA."

Defendant now contends use of the term "kill zone" in the instruction was inflammatory and unnecessary, and, hence, constituted reversible error. Alternatively, he says that if use of the term was proper, the trial court was required to define it because it has a technical legal meaning, and failure to do so was prejudicial error. We reject both claims.

The doctrine of transferred intent does not apply to the crime of attempted murder. (People v. Bland (2002) 28 Cal.4th 313, 317 (Bland).) "A person who intends to kill only one is guilty of the attempted (or completed) murder of that one but not also of the attempted murder of others the person did not intend to kill." (Ibid.) Thus, in order to be convicted of multiple counts of attempted murder, each involving a different victim, the prosecution must prove the perpetrator acted with the specific intent to kill each victim. (People v. Smith (2005) 37 Cal.4th 733, 739.) "The defendant's mental state must be examined as to each alleged attempted murder victim. Someone who intends to kill only one person and attempts unsuccessfully to do so, is guilty of the attempted murder of the intended victim, but not of others." (Bland, supra, 28 Cal.4th at p. 328.)

A person who shoots at a group of people may nevertheless be found guilty of the attempted murder of everyone in the group, even if he or she primarily targeted only one of them, if the person also, concurrently, intended to kill others within what has been termed the "'kill zone.'" (Bland, supra, 28 Cal.4th at p. 329.) "'The intent is concurrent ... when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity. For example, an assailant who places a bomb on a commercial airplane intending to harm a primary target on board ensures by this method of attack that all passengers will be killed. Similarly, consider a defendant who intends to kill A and, in order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group. The defendant has intentionally created a "kill zone" to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim....Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone.'" (Id. at pp. 329–330; see People v.Vang (2001) 87 Cal.App.4th 554, 563–564.)

The kill zone theory thus "addresses the question of whether a defendant charged with the

murder or attempted murder of an intended target can also be convicted of attempting to murder other, nontargeted, persons." (People v. Stone (2009) 46 Cal.4th 131, 138.) "[A] shooter may be convicted of multiple counts of attempted murder on a 'kill zone' theory where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the 'kill zone') as the means of accomplishing the killing of that victim. Under such circumstances, a rational jury could conclude beyond a reasonable doubt that the shooter intended to kill not only his targeted victim, but also all others he knew were in the zone of fatal harm. [Citation.]" (People v. Smith, supra, 37 Cal.4th at pp. 745–746; see People v. Ervine (2009) 47 Cal.4th 745, 789 [intent required for attempted murder can be satisfied by intent to kill particular person and by generalized intent to kill someone]; but see People v. Perez (2010) 50 Cal.4th 222, 225, 230–231 [indiscriminate firing of single shot at group of persons, without more, does not amount to attempted murder of everyone in group].) As stated in Bland, supra, 28 Cal.4th at pages 330–331: "Even if the jury found that defendant primarily wanted to kill [the driver of the car] rather than [the driver's] passengers, it could reasonably also have found a concurrent intent to kill those passengers when defendant and his cohort fired a flurry of bullets at the fleeing car and thereby created a kill zone. Such a finding fully supports attempted murder convictions as to the passengers." (Fn.omitted.)

Defendant does not challenge application of the theory of concurrent intent to his case, but says the legal principles should have been conveyed to the jury without using the term "kill zone." Use of this "irrelevant and inflammatory" term, he contends, violated his federal constitutional rights and requires reversal of his convictions on counts 2 and 3. He recognizes that the court in People v. Campos (2007) 156 Cal.App.4th 1228 (Campos) held otherwise, but urges us not to follow that decision.

We agree with the Attorney General that defendant's claim has been forfeited by his failure to object to use of the term "kill zone" at trial. We previously have concluded CALCRIM No. 600 correctly states the law. (People v. Lawrence (2009) 177 Cal.App.4th 547, 557.) "A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification [or modification] of an otherwise correct instruction forfeits the claim of error for purposes of appeal. [Citations.]" (People v. Lee (2011) 51 Cal.4th 620, 638; see also Campos, supra, 156 Cal.App.4th at p. 1236.)

In any event, we agree with Campos on the merits. That case rejected the argument use of the phrase "kill zone" is inflammatory, argumentative, and inappropriate, saying: "An instruction is argumentative when it recites facts drawn from the evidence in such a manner as to constitute argument to the jury in the guise of a statement of law. [Citation.] 'A jury instruction is [also] argumentative when it is "'of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence.' [Citations.]" ' [Citation.] [¶] CALCRIM No. 600 merely employs a term, 'kill zone,' which was coined by our Supreme Court in Bland and referred to in later California Supreme Court cases. [Citation.] It does not invite inferences favorable to either party and does not integrate facts of this case as an argument to the jury. Other disparaging terms, including 'flight' [citation], 'suppress[ion] of evidence' [citation] and 'consciousness of guilt' [citation] have been used in approved, longstanding CALJIC instructions. We see nothing argumentative in this instruction." (Campos, supra, 156 Cal.App.4th at p. 1244.)

Defendant argues, however, that inclusion of the term in the attempted murder instruction improperly suggested he "was a person of bad character prone to committing violent acts within a lethal territory created by [defendant] and his companions, a 'kill zone.'" Since inviting jurors to consider bad character as a basis for conviction violated due process, he claims, federal constitutional error occurred.

We categorically reject the notion that use of the phrase "kill zone" suggests anything about a defendant, or that it is irrelevant to the issues, or poses a threat of prejudicing jurors against a

defendant.  It does not run afoul of the principle that jury instructions must be neutral and nonargumentative.  (See, e.g.,  People v. Gordon (1990) 50 Cal.3d 1223, 1276, overruled on another ground in People v. Edwards (1991) 54 Cal.3d 787, 835; People v. Wright (1988) 45 Cal.3d 1126, 1143.)  If anything, use of the term emphasizes the requirement of an intent to kill in a way "zone of harm" or "zone of danger" (either of which, we suspect, would come under challenge for improperly stating, or creating an ambiguity with respect to, the mental state required for attempted murder)  do not. That the phrase "zone of fatal harm" might convey the same requirement does not mean "kill zone" is improper.

Moreover, contrary to defendant's alternative claim, the trial court did not err by failing to define "kill zone" for jurors.  As defendant acknowledges, the California Supreme Court has rejected the argument such a definition is required.  (E.g.,  People v. Stone, supra, 46 Cal.4th at pp. 137–138; People v. Smith, supra, 37 Cal.4th at pp. 756–757; Bland, supra, 28 Cal.4th at p. 331, fn. 6.)  Defendant's assertion we should address the issue despite this adverse authority necessarily fails. (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455.)

(Doc. 13, Ex. A, pp. 77-82).

### 2.    Federal Standard

The issue of whether a jury instruction is a violation of state law is neither a federal question nor a proper subject for habeas corpus relief. Estelle v. McGuire, 502 U.S. 62, 68 (1991). ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.' "), quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990); Gilmore v. Taylor, 508 U.S. 333, 348-49 (1993) (O'Connor, J., concurring) ("mere error of state law, one that does not rise to the level of a constitutional violation, may not be corrected on federal habeas"). Indeed, federal courts are bound by state court rulings on questions of state law.  Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir.), cert. denied, 493 U.S. 942 (1989).

In reviewing an ambiguous instruction, the inquiry is not how reasonable jurors could or would have understood the instruction as a whole; rather, the Court must inquire whether there is a "reasonable likelihood" that the jury applied the challenged instruction in a way that violates the Constitution.  See Estelle v. McGuire, 502 U.S. at 72 & n. 4; Boyde v. California, 494 U.S. 370, 380, (1990).  However, a determination that there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the Constitution establishes only that an error has occurred. See Calderon v. Coleman, 525 U.S. 141, 146 (1998). If an error is found, the Court also must determine that the error had a substantial and injurious effect or influence in determining the jury's verdict before granting habeas relief. See Id. at 146–47 (citing Brecht v. Abrahamson, 507 U.S. 619 (1993)).

In determining whether instructional error warrants habeas relief, a habeas court must consider

17

1   "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates

2   due process' ... not merely whether 'the instruction is undesirable, erroneous, or even universally

3   condemned.'" Henderson v. Kibbe, 431 U.S. 145, 154 (1977) (*quoting* Cupp v. Naughten, 414 U.S.

4   141, 146-47 (1973)); California v. Roy, 519 U.S. 2, 5 (1996) (challenge in habeas to the trial court's

5   jury instructions is reviewed under the standard in Brecht v. Abrahamson, 507 U.S. at 637--whether the

6   error had a substantial and injurious effect or influence in determining the jury's verdict).  The burden

7   of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack

8   on the constitutional validity of a state court's judgment is even greater than the showing required to

9   establish plain error on direct appeal. Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996).

10      The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction

11   except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which

12   he is charged." In re Winship, 397 U.S. 358, 364 (1970).  In a criminal case, an evidentiary device

13   must not undermine the fact-finder's responsibility at trial, based on evidence adduced by the State, to

14   find the ultimate facts beyond a reasonable doubt.  County Court of Ulster County, N. Y. v. Allen, 442

15   U.S. 140, 156 (1979); In re Winship, 397 U.S. 358, 364 (1970).

16      The United States Supreme Court has held that "the Constitution does not require that any

17   particular form of words be used in advising the jury of the government's burden of proof.  Rather,

18   taken as a whole, the instructions must correctly convey the concept of reasonable doubt to the jury."

19   Victor v. Nebraska, 511 U.S. 1, 5 (1994).  This standard reduces the chance that an innocent person will

20   be conviction.  In re Winship, 397 U.S. at 362.  Winship does not require that every single fact upon

21   which the jury relies be proven to a reasonable doubt.  Many facts not proven to that standard may,

22   collectively, allow the jury to infer that an element of the crime is proven beyond a reasonable doubt.

23   To enforce Winship's rule, judges must instruct juries that they cannot return a guilty verdict unless the

24   government has met this burden.  Cool v. United States, 409 U.S. 275, 278 (1972).  A jury conviction

25   based upon an impermissibly low quantum of proof violates the jury trial guarantee of the Sixth

26   Amendment.  Sullivan v. Louisiana, 508 U.S. 275, 278 (1993).  A judge can violate a defendant's rights

27   by giving an instruction that undercuts the force of an otherwise proper beyond-a-reasonable-doubt

28   instruction.  See, e.g., Cool, 409 U.S. at 102-103; Sandstrom v. Montana, 442 U.S. 510, 521 (1979).

18

When a jury instruction is susceptible to a reading that would render the verdict unconstitutional and another that would generate a proper verdict, the reviewing court considers the challenged instruction in light of the full jury charge and in the context of the entire trial.  See Naughten, 414 U.S. at 145-147(consider charge as whole); United States v. Park, 421 U.S. 658, 675 (1975)(consider context of whole trial).  The court must then decide whether there is a reasonable likelihood that the jury applied the challenged instruction in an unconstitutional manner.  Estelle, 502 U.S. at 72.  A verdict remains valid if a jury instruction only tangentially undercut a proper beyond-a-reasonable-doubt instruction.  Naughten, 414 U.S. at 149-150.

> 3.    Analysis

Under California law, attempted murder requires a specific intent to kill; implied malice will not suffice. People v. Lee, 31 Cal.4th 613, 623 (2003).  First degree murder may be found when the prosecution proves beyond a reasonable doubt that the actor killed with malice aforethought, intent to kill, premeditation, and deliberation.  People v. Memro, 11 Cal.4th 786, 862 (1995); see also Cal. Pen.Code §§ 187, 189.  Intent to kill is rarely proved by direct evidence; usually it must be inferred from circumstantial evidence.  People v. Ramos, 121 Cal.App.4th 1194, 1207–1208 (2004).

In People v. Bland, 28 Cal.4th 313 (2002), the California Supreme Court held that attempted murder requires the specific "intent to kill the alleged victim, not someone else. The defendant's mental state must be examined as to each alleged attempted murder victim. Someone who intends to kill only one person and attempts unsuccessfully to do so, is guilty of the attempted murder of the intended victim, but not of others." Bland, 28 Cal.4th at 328.  Bland also held, however, that there could be a concurrent intent such that "a person who shoots at a group of people [may still] be punished for the actions towards everyone in the group even if that person primarily targeted only one of them."  Id. at 329.  Concurrent intent can be inferred "'when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity,'" an area referred to as a "kill zone."  Id.  Bland noted that "[t]his concurrent intent theory is not a legal doctrine requiring special jury instructions, as is the doctrine of transferred intent.  Rather, it is simply a reasonable inference the jury may draw in a given case: a primary intent to kill a specific target does not rule out a concurrent intent to kill others."

1   Id. at 331.

2        Petitioner focuses on the fact that the language in the instruction itself referring to "killing"

3   individuals in the "zone of harm" or "kill zone," was inflammatory, prejudicial, and not clearly defined

4   in the instructions.  First, to the extent that Petitioner is contending simply that the trial court instructed

5   the jury contrary to California law, such a contention would be beyond the purview of this Court in a

6   federal habeas proceeding.  As explained previously, the issue of whether a jury instruction is a

7   violation of state law is neither a federal question nor a proper subject for habeas corpus relief.  Estelle

8   v. McGuire, 502 U.S. at 68. ("We have stated many times that 'federal habeas corpus relief does not lie

9   for errors of state law.'"); Gilmore v. Taylor, 508 U.S. 333, 348–49 (1993) (O'Connor, J., concurring)

10  ("mere error of state law, one that does not rise to the level of a constitutional violation, may not be

11  corrected on federal habeas").  As discussed earlier, this Court is in fact bound by state court rulings on

12  questions of state law.  Oxborrow v. Eikenberry, 877 F.2d at 1399.

13       Second, to the extent that Petitioner is charging a federal constitutional violation, he must show

14  the purported instructional error "so infected the trial with unfairness as to make the resulting

15  conviction a denial of due process."  Lewis v. Jeffers, 497 U.S. at 780. Petitioner has failed to meet that

16  burden.

17       Initially, the Court notes that Petitioner has never contended that the instruction as given was

18  not a correct statement of California law.  Rather, he complains that the phrase "kill zone" itself would

19  inflame and prejudice the jury against him.  In its decision in this case, however, the 5th DCA pointed

20  out that the California appellate court had previously rejected the contention that the phrase was

21  inflammatory, argumentative, and inappropriate, citing People v. Campos, 156 Cal.App.4th 1228, 1244

22  (2007).  The 5th DCA "categorically" rejected to notion that the phrase "kill zone"  suggested anything

23  negative about Petitioner or posed a threat of prejudicing the jurors, noting that more euphemistic

24  phrases like "zone of harm" or zone of danger" did not squarely focus on the intent to kill in the manner

25  that "kill zone" did.  As such, the phrase about which Petitioner complains was less likely to confuse or

26  mislead the jury than a more circumspect and watered-down phrase might do.

27       Regarding the failure to provide a precise definition of "kill zone," the 5th DCA pointed out that

28  the California Supreme Court had previously rejected such an argument, citing People v. Stone, 46

1  Cal.4th 131, 137-138 (2009).  Stone emphasized that, in Bland, the state high court had noted that the

2  "kill zone" theory was "not a legal doctrine requiring special jury instructions," but was simply a

3  reasonable inference the jury may draw in a given case.  Id.  Thus, under California law, no further

4  definition of "kill zone" is required, and Petitioner has not identified, nor is the Court aware of, any

5  federal authority for the proposition that federal due process requires that such a phrase be defined in a

6  jury instruction.

7      Indeed, the California Supreme Court has expressly held that no set definition of "kill zone"

8  exists; rather, the phrase is "necessarily defined by the nature and scope of the attack" in any given

9  situation.  People v. Perez, 50 Cal.4th 222, 232 (2010).  A determination of state law by a state appellate

10  court is binding in a federal habeas action,  Hicks v. Feiock, 485 U.S. 624, 629 (1988), unless the

11  interpretation is an "obvious subterfuge to evade consideration of a federal issue." Mullaney v. Wilbur,

12  421 U.S. 684, 691 n. 11 (1975); Lewis v. Jeffers, 497 U.S. 764, 780 (1990) (federal habeas court must

13  respect a state court's application of its own law and must not engage in de novo review).  A federal

14  court has no basis for disputing a state's interpretation of its own law. Clemons v. Mississippi, 494 U.S.

15  738, 739–740 (1990).

16      As a whole, the instructions adequately instructed the jury regarding the burden of proof for

17  attempted murder and the role of a "kill zone" in the jury's deliberations of guilt. The jury is presumed

18  to have followed those instructions. Weeks v. Angelone, 528 U.S. 225, 234 (2000).  Accordingly, the

19  state court decision is not contrary to nor an unreasonable application of clearly established federal law.

20  28 U.S.C. § 2254(d). Hence, the claim should be denied.

21      C.    Judicial Bias

22      Petitioner next argues that his conviction was the result of judicial bias.  In addition to

23  contesting the merits of this claim, Respondent also argues that it is unexhausted and procedurally

24  defaulted.

25          1.    Exhaustion

26      A petitioner who is in state custody and wishes to collaterally challenge his conviction by a

27  petition for writ of habeas corpus must exhaust state judicial remedies.  28 U.S.C. § 2254(b)(1).  The

28  exhaustion doctrine is based on comity to the state court and gives the state court the initial opportunity

1   to correct the state's alleged constitutional deprivations.  Coleman v. Thompson, 501 U.S. 722, 731

2   (1991); Rose v. Lundy, 455 U.S. 509, 518 (1982); Buffalo v. Sunn, 854 F.2d 1158, 1163 (9th Cir.

3   1988).

4          A petitioner can satisfy the exhaustion requirement by providing the highest state court with a

5   full and fair opportunity to consider each claim before presenting it to the federal court.  Duncan v.

6   Henry, 513 U.S. 364, 365 (1995); Picard v. Connor, 404 U.S. 270, 276 (1971); Johnson v. Zenon, 88

7   F.3d 828, 829 (9th Cir. 1996).  A federal court will find that the highest state court was given a full and

8   fair opportunity to hear a claim if the petitioner has presented the highest state court with the claim's

9   factual and legal basis.  Duncan, 513 U.S. at 365 (legal basis); Kenney v. Tamayo-Reyes, 504 U.S. 1,

10  112 (1992) (factual basis).

11         Additionally, the petitioner must have specifically told the state court that he was raising a

12  federal constitutional claim.  Duncan, 513 U.S. at 365-66; Lyons v. Crawford, 232 F.3d 666, 669 (9th

13  Cir. 2000), *amended*, 247 F.3d 904 (2001); Hiivala v. Wood, 195 F.3d 1098, 1106 (9th Cir. 1999);

14  Keating v. Hood, 133 F.3d 1240, 1241 (9th Cir. 1998).  The Supreme Court reiterated the rule as

15  follows:

16         In Picard v. Connor, 404 U.S. 270, 275 . . . (1971), we said that exhaustion of state remedies
           requires that petitioners "fairly presen[t]" federal claims to the state courts in order to give the
17         State the "opportunity to pass upon and correct alleged violations of the prisoners' federal
           rights" (some internal quotation marks omitted).  If state courts are to be given the opportunity
18         to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact
           that the prisoners are asserting claims under the United States Constitution. If a habeas
19         petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due
           process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal
20         court, but in state court.
           Duncan, 513 U.S. at 365-366.  The Ninth Circuit examined the rule further, stating:
21
           Our rule is that a state prisoner has not "fairly presented" (and thus exhausted) his federal
22         claims in state court *unless he specifically indicated to that court that those claims were based
           on federal law*. See Shumway v. Payne, 223 F.3d 982, 987-88 (9th Cir. 2000). Since the
23         Supreme Court's decision in Duncan, this court has held that the *petitioner must make the
           federal basis of the claim explicit either by citing federal law or the decisions of federal courts,
24         even if the federal basis is "self-evident*," Gatlin v. Madding, 189 F.3d 882, 889 (9th Cir. 1999)
           (citing Anderson v. Harless, 459 U.S. 4, 7 . . . (1982), or the underlying claim would be
25         decided under state law on the same considerations that would control resolution of the claim
           on federal grounds. Hiivala v. Wood, 195 F3d 1098, 1106-07 (9th Cir. 1999); Johnson v.
26         Zenon, 88 F.3d 828, 830-31 (9th Cir. 1996); . . . .

27         In Johnson, we explained that the petitioner must alert the state court to the fact that the
           relevant claim is a federal one without regard to how similar the state and federal standards for
28         reviewing the claim may be or how obvious the violation of federal law is.

Lyons v. Crawford, 232 F.3d 666, 668-669 (9th Cir. 2000) (italics added), as amended by Lyons v. Crawford, 247 F.3d 904, 904-5 (9th Cir. 2001).

        2.      Procedural Default

Respondent contends that Petitioner's claim must be rejected because it is procedurally defaulted.  Respondent points out that, in denying Petitioner's state habeas claim, the state court cited Swain and Duvall.  After reviewing the facts and applicable law, the Court agrees that the nature of the procedural bar means that the claim fails to meet the exhaustion requirement because it has not been "fairly presented" to the state courts.

State courts may decline to review a claim based on a procedural default. Wainwright v. Sykes, 433 U.S. 72, 86–87 (1977).  Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729 (1991); LaCrosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001); see Ylst v. Nunnemaker, 501 U.S. 797, 801 (1991); Park v. California, 202 F.3d 1146, 1150 (2000) ("A district court properly refuses to reach the merits of a habeas petition if the petitioner has defaulted on the particular state's procedural requirements . . . ."); see also Fox Film Corp. v. Muller, 296 U.S. 207, 210 (1935).  This concept has been commonly referred to as the procedural default doctrine.  This doctrine of procedural default is based on concerns of comity and federalism. Coleman, 501 U.S. at 730-32.  If the court finds an independent and adequate state procedural ground, "federal habeas review is barred unless the prisoner can demonstrate cause for the procedural default and actual prejudice, or demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice." Noltie v. Peterson, 9 F.3d 802, 804-805 (9th Cir. 1993); Coleman, 501 U.S. at 750; Park v. California, 202 F.3d 1146, 1150 (9th Cir. 2000).

The mere occurrence, however, of a procedural default will not necessarily bar a federal court from reviewing claims in a petition for writ of habeas corpus.  In order for the procedural default doctrine to apply and thereby bar federal review, the state court determination of default must be grounded in state law that is both *adequate* to support the judgment and *independent* of federal law. Ylst, 501 U.S. at 801; Coleman, 501 U.S. at 729-30; see also Fox Film Corp., 296 U.S. at 210.  Put

1   another way, the procedural default doctrine will apply only if the application of the state procedural

2   rule provides "an adequate and independent state law basis" on which the state court can deny relief.

3   Park, 202 F.3d at 1151, *quoting*, Coleman, 501 U.S. at 729-30.

4       "For a state procedural rule to be 'independent,' the state law basis for the decision must

5   not be interwoven with federal law." LaCrosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001) (*citing*

6   Michigan v. Long, 463 U.S. 1032, 1040-41 (1983)).  "A state law is so interwoven if 'the state has

7   made application of the procedural bar depend on an antecedent ruling on federal law [such as] the

8   determination of whether federal constitutional error has been committed.'"  Park, 202 F.3d at 1152

9   (*quoting* Ake v. Oklahoma, 470 U.S. 68, 75 (1985)).

10      To be deemed adequate, the state law ground for decision must be well-established and

11  consistently applied.  Poland v. Stewart, 169 F.3d 573, 577 (9th Cir. 1999).  Although a state court's

12  exercise of judicial discretion will not necessarily render a rule inadequate, the discretion must entail

13  "'the exercise of judgment according to standards that, at least over time, can become known and

14  understood within reasonable operating limits.'"  Id. at 377 (*quoting* Morales, 85 F.3d at 1392).

15      Under California law, a citation to People v. Duvall, 9 Cal.4th 464, 474 (1995), indicates that a

16  petitioner has failed to state his claim with sufficient particularity for the state court to examine the

17  merits of the claim, and/or has failed to "include copies of reasonably available documentary evidence

18  supporting the claim, including pertinent portions of trial transcripts and affidavits or declarations."

19  Duvall, 9 Cal.4th at 474.

20      Like Duvall, a citation to Swain stands for the proposition that a petitioner has failed to state his

21  claim with sufficient particularity.  In Kim v. Villalobos, 799 F.2d 1317, 1319 (9th Cir. 1986), the Ninth

22  Circuit found that the Swain citation indicated that the claims were unexhausted because their pleadings

23  defects, i.e., lack of particularity could be cured in a renewed petition.  Kim, 799 F.2d at 1319.

24      In Kim, the Ninth Circuit also stated that it was "incumbent" on the district court, in

25  determining whether the federal standard of "fair presentation" of a claim to the state courts had been

26  met, to independently examine Kim's petition to the California Supreme Court.  Id. at 1320.  "The mere

27  recitation of In re Swain does not preclude such review."  Id.  Indeed, the Ninth Circuit has held that

28  where a prisoner proceeding pro se is unable to meet the state rule that his claims be pleaded with

1   particularity, he may be excused from complying with it.  Harmon v. Ryan, 959 F.2d 1457, 1462 (9th

2   Cir. 1992)(citing Kim, 799 F.2d at 1321).  "Fair presentation" requires only that the claims be pleaded

3   with as much particularity as is practicable.  Kim, 799 F.2d at 1320.

4          Petitioner's state petition shows, as Respondent has noted, that Petitioner failed to supply the

5   state courts with critical documents needed to resolve the issue, i.e., specific and relevant pages from

6   the Reporter's Transcript that, Petitioner contends, would have shown judicial bias.  This is so despite

7   the fact that Petitioner was in possession of such documents.  (LD 22).  Accordingly, the California

8   Supreme Court's denial of this claim with citations to Swain and Duvall indicates that the claim was

9   not "fairly presented" to the state high court and that Petitioner could have re-submitted a state habeas

10  petition with greater specificity but did not.  Petitioner's failure to do so means that the claim is

11  unexhausted.  Accordingly, it should be denied on that ground.

12                3.    Federal Standard

13         "The Due Process Clause entitles a person to an impartial and disinterested tribunal."  Marshall

14  v. Jerrico, Inc., 446 U.S. 238, 243 (1980).  In addition, "justice must satisfy the appearance of justice."

15  Offutt v. United States, 348 U.S. 11, 14 (1954).  As stated by the United States Supreme Court: A fair

16  trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of

17  actual bias in the trial of cases. But our system of law has always endeavored to prevent even the

18  probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to

19  try cases where he has an interest in the outcome.  In re Murchison, 349 U.S. 133, 136 (1955). See also

20  Taylor v. Hayes, 418 U.S. 488 (1974).  A trial judge "must be ever mindful of the sensitive role [the

21  court] plays in a jury trial and avoid even the appearance of advocacy or partiality."  Kennedy v. Los

22  Angeles Police Dep't, 901 F.2d 702, 709 (9th Cir.1989), overruled on other grounds by Hunter v.

23  Bryant, 502 U.S. 224 (1991) (quoting United States v. Harris, 501 F.2d 1, 10 (9th Cir.1974)).

24         To sustain a claim of judicial bias, "there must be an 'extremely high level of interference' by

25  the trial judge that creates 'a pervasive climate of partiality and unfairness.'"  Duckett v. Godinez, 67

26  F.3d 734, 740 (9th Cir.1995) (quoting United States v. DeLuca, 692 F.2d 1277, 1282 (9th Cir.1982)).

27  See also In re Murchison, 349 U.S. at 136 (judicial bias resulted in a denial of due process where the

28  same judge who had sat as the 'grand jury' before which witnesses had testified also presided at a

1   contempt hearing at which those witnesses were adjudged in contempt for their previous conduct before

2   the judge); Tumey v. Ohio, 273 U.S. 510, 523 (1927) (violation of due process where judge had a direct

3   personal pecuniary interest in convicting the defendant who came before him for trial).  However, in

4   attempting to make out a claim of unconstitutional bias, a plaintiff must "overcome a presumption of

5   honesty and integrity" on the part of decision-makers. Withrow v. Larkin, 421 U.S. 35, 47 (1975).

6   Finally, if a criminal defendant is not tried by an impartial adjudicator, the error is structural, i.e.,

7   reversal is required without consideration of whether the error was harmless.  Neder v. United States,

8   527 U.S. 1, 8 (1999); Gomez v. United States, 490 U.S. 858, 876 (1989) (denial of "right to an

9   impartial adjudicator, be it judge or jury" can never be harmless error) (citation omitted).

10              4.      Analysis of Merits

11                  a.      Standard of Review

12          For the four remaining claims, no reasoned decision is available.  Rather, those claims were

13   raised in the California Supreme Court and summarily denied.  When a state court decision on a

14   petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas

15   court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. Johnson v.

16   Williams, —— U.S. ——, ——, 133 S.Ct. 1088, 1091, 185 L.Ed.2d 105 (2013).  Thus, where, as here,

17   such circumstances exist, the California Supreme Court's summary denial of Petitioner's state habeas

18   petition was on the merits.

19          Moreover, where the state court reaches a decision on the merits but, as here, provides no

20   reasoning to support its conclusion, a federal habeas court independently reviews the record to

21   determine whether habeas corpus relief is available under § 2254(d). Stanley v. Cullen, 633 F.3d 852,

22   860 (9th Cir. 2011); Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.2003); Greene v. Lambert, 288

23   F.3d 1081, 1089 (9th Cir.2002) (when there is an adjudication on the merits but no reason for the

24   decision, the court must review the complete record to determine whether resolution of the case

25   constitutes an unreasonable application of clearly established federal law); Delgado v. Lewis, 223 F.3d

26   976, 982 (9th Cir. 2000) ("Federal habeas review is not de novo when the state court does not supply

27   reasoning for its decision, but an independent review of the record is required to determine whether the

28   state court clearly erred in its application of controlling federal law.").  "[A]lthough we independently

1    review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d

2    1160, 1167 (9th Cir. 2002). "Independent review of the record is not de novo review of the

3    constitutional issue, but rather, the only method by which we can determine whether a silent state court

4    decision is objectively unreasonable." Himes, 336 F.3d at 853. Where no reasoned decision is available,

5    the petitioner still has the burden of "showing there was no reasonable basis for the state court to deny

6    relief." Harrington, 131 S.Ct. at 784. Thus, this Court will independently review the remaining four

7    claims to determine if no reasonable basis for denying relief existed.

8                                    b.        Merits Analysis

9            Here, even if the claim was exhausted, it still lacks merit on independent review. Citing to

10   specific portions of the trial transcript, Petitioner contends the trial judge showed bias by his "continual

11   interjection" into witnesses' testimony, causing "jurors to decide the case in a way" the judge thought

12   correct. (Doc. 1, p. 8) In support of his contention, Petitioner cites two episodes at trial. The first

13   involved witness Isabel Rodriguez. During her testimony, she stated Petitioner's car had "flipped it"

14   and "turned around." (4 RT 63) However, on redirect and re-cross-examination, she indicated the car

15   eventually wound up in front of her house, a fact that appeared to be inconsistent with her previous

16   description of a U-turn. (4 RT 107-108) Using a diagram of the area, the judge asked Rodriguez to

17   clarify which direction the car had been headed when the shots were fired. (4 RT 107-108) Rodriguez

18   then indicated that the car had made a complete circle, not simply a U-turn. (4 RT 110)

19           Later, Rodriguez admitted she used to associate with or "hang out" with gang members but that

20   she was not doing that at the time of the crimes. Rodriguez was asked to clarify what she meant by

21   "hang out" and "associate" with gang members. (4 RT 67) On cross-examination, she was asked

22   whether she knew the gang members. (4 RT 85) The court interjected that the witness had testified she

23   said "hi" to the gang members once in a while but did not say she talked to them. (4 RT 87) Counsel

24   then attempted to elicit from Rodriguez further details about how much and how often she talked to

25   gang members. (4 RT 87)

26           The first episode cannot in any way be considered indicative of bias or prejudice. To the

27   contrary, the judge was simply performing the appropriate judicial function of clarifying what was

28   otherwise a potentially confusing and contradictory statement by Rodriguez regarding the actual

                                                    27

direction of the car when the shots were fired.  As to the second episode, even if one could infer some overzealousness on the part of the judge as to clarifying Rodriguez's testimony, any "interference" in the witness's testimony was *de minimis*.  Certainly, the judge's conduct did not rise to the level of creating a pervasive climate of partiality or unfairness.

The second area of dispute occurred prior to the re-trial when the judge advised Petitioner that, if he chose to testify at the retrial, the convictions from the first trial were admissible for impeachment purposes.  (8 RT 365-366)  Petitioner had requested that those convictions from the first trial not be revealed to the jurors at the re-trial.  (8 RT 365)  In advising Petitioner, the judge made clear that the decision whether to testify at his re-trial was solely Petitioner's choice.  (8 RT 366)  Petitioner does not indicate how this advisement is either a violation of state law or in contravention of his federal due process rights.  In his state petition, he argued that the trial court essentially threatened him if he testified and that the potential for impeachment at the retrial forced him to forego a defense used at the first trial.  However, as Respondent points out, Petitioner did not testify in the first trial, thus contradicting any contention that Petitioner's testimony was vital to that defense.

Far from establishing any ongoing or pervasive pattern of bias or prejudice by the trial judge, the record shows that the judge attempted to control the presentation of evidence in a clear and comprehensible manner for the jury and in such a way as to avoid confusion or misunderstanding. Nothing in this record even remotely suggests that the judge was biased against Petitioner.  Moreover, even if such *de minimis* actions by the trial court could technically be considered error, they were harmless under <u>Brecht</u>.

     D.    <u>Prosecutorial Misconduct</u>

Petitioner's next claim is that the prosecutor committed misconduct by suggesting to the jury that it should convict him because other gang members had been convicted.

         1.    <u>Exhaustion and Procedural Default</u>

For the same reasons set forth in the preceding claim, this claim is also unexhausted and should be dismissed on that ground.

         2.    <u>Federal Standard</u>

Under clearly established federal law, a prosecutor's improper comments will be held to violate

28

the Constitution only if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Parker v. Matthews, 132 S.Ct. 2148, 2153 (2012) (per curiam) (quoting Darden v. Wainright, 477 U.S. 168, 181–183 (1986)); see Sassounian v. Roe, 230 F.3d 1097, 1106 (9th Cir.2000). Prosecutorial misconduct deprives the defendant of a fair trial as guaranteed by the Due Process Clause if it prejudicially affects the substantial rights of a defendant. United States v. Yarbrough, 852 F.2d 1522, 1539 (9th Cir.1988) (citing Smith v. Phillips, 455 U.S. 209, 219 (1982)).

The standard of review of claims concerning prosecutorial misconduct in a § 2254 proceeding is the narrow standard of due process, and not the broad standard that applies in the exercise of supervisory power; improper argument does not, per se, violate a defendant's constitutional rights. Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir.2002) (citing Thompson v. Borg, 74 F.3d 1571, 1576 (9th Cir.1996)). This Court must thus determine whether the alleged misconduct has rendered a trial fundamentally unfair. Darden v. Wainwright, 477 U.S. at 183. It must be determined whether the prosecutor's actions constituted misconduct and whether the conduct violated Petitioner's right to due process of law. Drayden v. White, 232 F.3d 704, 713 (9th Cir.2000).

To grant habeas relief, this Court must conclude that the state court's rejection of the prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Parker, 132 S.Ct. at 2155 (quoting Harrington v. Richter, 131 S.Ct. at 767–87). The standard of Darden v. Wainwright is a very general one that provides courts with more leeway in reaching outcomes in case-by-case determinations. Parker, 132 S.Ct. at 2155 (citing Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004)).

In determining whether the prosecutor's remarks rendered a trial fundamentally unfair, the remarks must be analyzed in the context of the entire proceeding.  Boyde v. California, 494 U.S. 370, 385 (1990); Darden, 477 U.S. at 179–182.  Furthermore, counsel are "given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom."  Ceja v. Stewart, 97 F.3d 1246, 1253–1254 (9th Cir.1996) (quoting United States v. Baker, 10 F.3d 1374, 1415 (9th Cir.1993)).  A reviewing court should consider challenged remarks in light of the realistic nature of closing arguments at trial.

29

1    "Because 'improvisation frequently results in syntax left imperfect and meaning less than crystal clear,'

2    'a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most

3    damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the

4    plethora of less damaging interpretations'." <u>Williams v. Borg</u>, 139 F.3d 737, 744 (9th Cir.) (quoting

5    <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 646–647 (1974)), cert. denied, 525 U.S. 937 (1998).  Finally,

6    even when prosecutorial misconduct rises to the level of a due process violation, such misconduct

7    provides grounds for habeas relief only if that misconduct is prejudicial under the harmless error test

8    articulated in <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637–638 (1993).  <u>Shaw v. Terhune</u>, 380 F.3d 473,

9    478 (9th Cir.2004).

10          Factors to be considered in determining whether habeas corpus relief is warranted include

11   whether the prosecutor manipulated or misstated the evidence; whether his comments implicated other

12   specific rights of the accused; whether the objectionable content was invited or provoked by defense

13   counsel's argument; whether the trial court admonished the jurors; and the weight of evidence against

14   the defendant.  <u>Darden</u>, 477 U.S. at 181 (quoting <u>Donnelly</u>, 416 U.S. 637, 643, 94 S.Ct. 1868, 40

15   L.Ed.2d 431 (1974).)  "[T]he <u>Darden</u> standard is a very general one, leaving courts 'more leeway...in

16   reaching outcomes in case-by-case determinations [ ]' (<u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664,

17   (2004))....."; <u>Parker v. Matthews</u>, 132 S.Ct. 2148, 2155 (2012). Thus, even where a prosecutor's

18   argument, questions or behavior are found improper, relief is limited to cases in which a petitioner can

19   establish that the misconduct resulted in actual, substantial prejudice.

20          3.    <u>Analysis</u>

21          As with the previous claim, even if the claim were exhausted, it is without merit on

22   independent review by this Court.  The petition argues that the prosecution, in closing argument,

23   "suggested that jurors convict Petitioner just as other members of SSK gang had [been] convicted…."

24   (Doc. 1, p. 10)  Petitioner cites to a specific portion of the trial transcript that does not support his

25   claim.  Instead, that passage includes a summary of evidence of shootings committed by two different

26   groups of South Side Kings gang members during 2006 and 2009, elicited by the prosecution as

27   prerequisite requirements for the gang enhancements.  At no point in the record did the prosecutor

28   suggest in any way that jurors should convict Petitioner merely because other members of his gang

30

had previously committed crimes.  More to the point, such an inference cannot reasonably be drawn from the prosecutor's comments, taken as a whole.  Petitioner's logic appears to be that, in a case involving gang charges, the prosecutor cannot even mention the predicate gang crimes because this would suggest to the jurors that the prosecutor believed the accused should be convicted simply because he was a member of a gang that committed crimes.  Obviously, this is not the law in California, and the Court is unaware of any federal authority holding that such reasonable and germane comments in closing argument would necessarily render the trial "fundamentally unfair." Darden v. Wainwright, 477 U.S. at 183.  Moreover, even if, by some tortured reading of the prosecutor's comments, those comments could be considered error, the error did not have a "substantial and injurious" effect on the outcome of the case, given the overwhelming evidence of Petitioner's guilt of at least the drive-by murder. Brecht v. Abrahamson, 507 U.S. 619, 623.

  E.  Reasonable Doubt Instruction

  Petitioner contends that the reasonable doubt instructions given to the jury, i.e., CALCRIM Nos. 200 and 222, unlawfully reduced the prosecution's burden of proof

    1.  Exhaustion and Procedural Default

  For the same reasons set forth in the preceding claims, this claim is also unexhausted and should be dismissed on that ground.

    2.  Analysis

  Again, even if exhausted, the claim would lack merit upon independent review.  As discussed supra, in determining whether instructional error warrants habeas relief, a habeas court must consider "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process' ... not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.'" Henderson v. Kibbe, 431 U.S. 145, 154 (1977) (quoting Cupp v. Naughten, 414 U.S. 141, 146–47 (1973)); California v. Roy, 519 U.S. 2, 5 (1996) (challenge in habeas to the trial court's jury instructions is reviewed under the standard in Brecht v. Abrahamson, 507 U.S. at 637—whether the error had a substantial and injurious effect or influence in determining the jury's verdict.).

  Here, the jury was instructed with revised version of CALCRIM No. 220 as follows:

  The fact that a criminal charge has been filed against the defendant is not evidence that the

31

charge is true. You must not be biased against the defendant just because he has been arrested, charged with a crime, or brought to trial.

A defendant in a criminal trial is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise.

Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.

In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty.

(1 Clerk's Transcript on Appeal ("1 CT") 180; 2 CT 292)

The jury was also instructed with CALCRIM No. 222, which state, in pertinent part, as follows:

You must decide what the facts are in this case. You must use only the evidence that was presented in this courtroom. "Evidence" is the sworn testimony of witnesses, the exhibits admitted into evidence, stipulations between the parties, and anything else I told you to consider as evidence.

Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence. Their questions are not evidence. Only the witnesses' answers are evidence. The attorneys' questions are significant only if they helped you to understand the witnesses' answers. Do not assume that something is true just because one of the attorneys asked a question that suggested it was true.

Petitioner argues that the two instructions in combination served to reduce the prosecution's burden of proof to something less than "beyond a reasonable doubt." (Doc. 1, p. 12) Petitioner explains that the two instructions, in combination, limited the jury's consideration of evidence to that presented at trial and "precluded them from considering the lack of other evidence to corroborate the eye witnesses testimony." (Doc. 1, p. 36) (emphasis supplied).

This contention, however, is unsupported by the instructions when read as a whole. The instructions merely advise the jury that it may not consider evidence that was not presented at trial, e.g., evidence gleaned from media or newspapers, or discovered through some other source. Nothing in the instructions suggests, even remotely, that jurors could not consider the *lack of evidence* as to a particular element of a charged offense. Moreover, Petitioner does not cite to any particular element of

32

1    any charge that would have been especially susceptible to such a construction, even were it reasonable

2    inferable from the jury charge as a whole.  Moreover, Petitioner has not cited, and the Court is unaware

3    of, any United States Supreme Court authority that requires that jurors be expressly instructed on the

4    lack or absence of evidence vis-à-vis reasonable doubt.  Accordingly, the state court adjudication

5    rejecting this claim was not objectively unreasonable.

6          F.     Ineffective Assistance of Appellate Counsel

7          Finally, Petitioner argues that his appellate counsel was ineffective for failing to raise claims

8    three, four, and five in the instant petition.

9          1.     Exhaustion and Procedural Default

10         For the same reasons set forth in the preceding claims, this claim is also unexhausted and

11   should be dismissed on that ground.

12         2.     Federal Standard and Analysis

13         In challenges to the effective assistance of appellate counsel, the same standards apply as with

14   the claims of ineffective assistance of trial counsel.  Smith v. Robbins, 528 U.S. 259, 285 (2000); Smith

15   v. Murray, 477 U.S. 527 (1986).   In Smith, the United States Supreme Court indicated that an appellate

16   attorney filing a merits brief need not and should not raise every non-frivolous claim.  Robbins, 528

17   U.S. at 288.  Rather, an attorney may select from among them in order to maximize the likelihood of

18   success on appeal.  Id.  As a result, there is no requirement that an appellate attorney raise issues that

19   are clearly untenable.  Gustave v. United States, 627 F.2d 901, 906 (9th Cir. 1980); see also Gillhan v.

20   Rodriguez, 551 F.2d 1182 (10th Cir. 1977).

21         In preceding sections of this Findings and Recommendation, this Court rejected Petitioner's

22   contentions regarding claims three, four, and five as lacking merit.  Since Petitioner's ineffectiveness

23   claim for appellate counsel is based on counsel's purported failure to raise claims three, four, and five

24   on direct appeal, it necessarily follows that no legitimate basis exists for a claim of ineffective

25   assistance on the part of appellate counsel for failing to raise those meritless issues.  Featherstone v.

26   Estelle, 948 F.2d 1497, 1507 (9th Cir. 1991).

27         Accordingly, Petitioner fails to show the state court's adjudication of this issue was contrary to

28   or an unreasonable application of clearly established federal law.  Thus, claim six should be denied.

1

**RECOMMENDATION**

2         Accordingly, the Court **RECOMMENDS** that Petitioner's Petition for Writ of Habeas Corpus

3    (Doc. 1), be **DENIED** with prejudice.

4         This Findings and Recommendation is submitted to the United States District Court Judge

5    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local

6    Rules of Practice for the United States District Court, Eastern District of California.  **Within 21 days**

7    after being served with a copy of this Findings and Recommendation, any party may file written

8    objections with the Court and serve a copy on all parties.  Such a document should be captioned

9    "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be

10   served and filed within 10 days (plus three days if served by mail) after service of the Objections.  The

11   Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The

12   parties are advised that failure to file objections within the specified time may waive the right to

13   appeal the Order of the District Court.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

14

15   IT IS SO ORDERED.

16      Dated:   **June 12, 2016**                    **/s/ Jennifer L. Thurston**
                                                UNITED STATES MAGISTRATE JUDGE
17

18

19

20

21

22

23

24

25

26

27

28